GEORGE W. FAY and W. W. COLLINS, Complainants, Appellees,

*vs.*

NICHOLAS K. OATLEY and. GEO. G. BLODGETT, Defendants, Appellants.

APPEAL IN EQUITY FROM THE MILWAUKEE CIRCUIT COURT.

Courts will not lend their aid in the consummation of a perversion and abuse of the process of the State.

Contracts based upon, and growing out of, a perversion and abuse of criminal process, are void, as against public policy.

The maxim, *falsus in uno,—falsus in omnibus,* holds as well in regard to answers in chancery, as to other modes of evidence.

*Semble :* That the duress of one of two makers of a promissory note, which might be a good defence to the note as to him, could not avail the other maker, who was under no such restraint ?

Where a creditor living in the State of New York, contrived the plan of procuring an indictment against his debtor living in Wisconsin, on the charge of incurring the debt, or obtaining the goods for which it was incurred, under false pretences; did procure said indictment to be found by a grand jury; caused a requisition to be issued thereon by the executive of the State of New York; and caused the accused to be arrested under a warrant from the executive of Wisconsin, issued on said requisition, and to be hand-cuffed, and menaced, with the sole view of inducing him to furnish security for his private debt, until the friends of the accused, at his instance, did furnish such security, when the accused was permitted to go at liberty :—*held,* that the securities so obtained were utterly void; being obtained through an abuse of legal process, and against public policy.

In the autumn of 1844, the complainant, Fay, then engaged in the mercantile business in the city of Milwaukee, purchased, on credit, a bill of goods at Buffalo, in the State of New York, of the defendant, Oatley, then a merchant of that city. In 1845, Fay failed in business, still owing the debt—about $2,800—to Oatley; and after some correspondence between them, and attempts at compromise and settlement, Oatley, being unable to get his pay, conceived the plan of procuring an indictment against Fay, on the charge of

obtaining the goods under false pretenses, contrary to the statute of the State of New York; and did procure said indictment to be found by the Grand Jury of the county of Erie, in that State, and procured the requisition of the executive of the State of New York upon the executive of the then Territory of Wisconsin, for the arrest and extradition of said Fay, as a fugitive from justice.

With this requisition said Oatley came on to Wisconsin about the first of July, 1847, accompanied by one Williams, the person appointed by the Governor of the State of New York to claim said Fay, and return with him to the State of New York to answer said indictment, and obtained from the Governor of Wisconsin the necessary warrant, under the requisition, which, by the advice of defendant, Blodgett, who was retained by Oatley to aid in effecting his purposes, was placed in the hands of J. T. Allen, a deputy sheriff of Milwaukee county, who proceeded to arrest said Fay in Winnebago county, in this State, and to bring him to Watertown, where he was met by Oatley, Blodgett, and Williams.

Upon leaving Watertown, in route for Milwaukee, Fay was hand-cuffed, and was accompanied by Blodgett to Summit, and was menaced with being run out of the State without the opportunity of consulting with counsel or his friends, and finally, under restraint of this arrest and custody, acceded to certain terms proposed by Blodgett and Oatley, and paid Blodgett fifty dollars in money, and executed a judgment note to Oatley for one hundred dollars, which he procured his brother-in-law, Collins, to sign with him; and also executed to Oatley five other notes with said Collins, for four hundred dollars each, which Collins secured by a mortgage on certain real estate, executed and acknowledged by him and his wife; the said Collins executing said notes, and furnishing said security at the instance of said Fay, and for the purpose of relieving him from said arrest.

After the giving of said securities to Oatley, Fay continued on with said Allen and Blodgett to Milwaukee, where he was permitted to go at large—in fact, was liberated from the

arrest; and was never delivered into the said Williams, the said agent of the executive of New York's hands or custody.

The mortgage was recorded by Oatley in Milwaukee county, where the mortgaged lands lie; and on the 5th day of January, 1848, Blodgett caused a judgment, against Fay and Collins, to be entered upon said judgment note, in Waukesha county, for the sum of $105, damages and costs; and caused an execution to be issued thereon, and the same to be levied upon the goods of Collins to satisfy the judgment.

The complainants aver that they were induced to pay the said cash, and execute the said notes for the purpose of procuring the discharge and release of said Fay, and no other; and that they were intimidated by threats, menaces, and oppressions of the said Oatley and Blodgett. And that the same were fraudulently and corruptly obtained, and in violation of the law of the land. And they "submit whether the "same are not utterly void and without a good and valid con-"sideration, and whether the same have not been obtained by "undue means, and against the policy of the laws; and whe-"ther the acts of said Oatley and the said Blodgett, in procur-"ing the same, were not in violation of the law of the land, "and the said notes and mortgage consequently voidable," &c.

The prayer of the bill is, that Oatley may be compelled to deliver up said notes and mortgages to be cancelled, and also to enter up satisfaction of the said judgment; and that the notes and mortgage be decreed void and of no effect.

The material allegations of the bill, and the answers of the defendants, as well as the testimony taken, are found abridged and copied at sufficient length and detail in the opinion of the court.

The Circuit Court, upon a hearing of the cause, May 5th, 1855, decreed the cancelation and vacation of the notes and mortgage, and perpetually enjoined the collection of the judgment against complainants.

From which decree the defendants appealed to this court.

*Finch and Lynde*, for Complainants, Appellees.

Where a party does an act, or makes a contract, when he is under duress, or the influence of extreme terror or threats, or of misapprehensions short of duress, a court of equity will relieve against it. 1 Story's Eq., § 239.

On this account, courts of equity watch with extreme jealousy all contracts made by a party while under imprisonment, and if there is the slightest ground to suspect oppression or imposition in such cases, they will set the contract aside. 1 Story Eq., § 239; Nichols vs. Nichols, 1 Atk., 409; 2 Ves. Sen., 634–5; Wilkinson vs. Stafford, 1 Ves. Jr., 43; Peel vs. ———, 16 Ves., 157; 2 Bro. Ch. R., 345.

Agreements entered into under duress are void, even at common law. Foshey vs. Ferguson, 5 Hill, 154; Evans vs. Bayleys, 2 Wend., 243; Watkins vs. Baird, 6 Mass., 506; Richardson vs. Duncan, 3 N. H. R., 508; Severance vs. Kimball, 8 Id., 386; Wilson vs. Luddorth, 1 Hen. & Munf., 310; Fisher vs. Shattuck, 11 Pick., 252.

*Jas. A. Mallory*, for Defendants, Appellants.

I. The bill contains no equity on which to found an application for relief to a court of equity. The only necessity for applying to a court of equity for relief, was the judgment and execution on the $100 note. There had been no proceedings to collect the other notes, or the mortgage, and against that judgment the law courts have full power to relieve, 9 J. R., 180; 7 Id., 319; 6 Id., 331.

II. The bill admits that the complainant, Fay, in the fall of 1844, became indebted to the defendant, Oatley, in the sum of $2,800, which, with interest, would amount, in the fall of 1847, to $3,388. This debt was discharged by Oatley for $2,150—$1,238 less than was justly due from Fay to Oatley.

Equity, therefore, required that the complainant, Fay, should have paid or secured the whole sum due before applying for relief.

III. If a person under legal arrest makes an agreement to pay a just debt, he cannot avoid it on the ground of duress.

1 Bl. Com., 136; Chitty on Cont., 207; 1 Parsons on Cont., 319, § 4, and cases cited; 1 Mass., 368; 13 Id. 371; 6 Id., 506; 11 Maine, 325; 13 Id., 146; Eastman's Dig., 249; 1 Caine's R., 511; 3 Id., 166; 14 J. R., 260; 15 Id., 256; 1 Wend., 37; 1 Hill, 343; 5 Id., 154; 2 Douglass, (Mich.,) 68.

IV. Collins cannot avoid the mortgage by alleging, the duress of Fay. The privilege of pleading duress is a mere personal privilege, and cannot be set up by the surety who was under no restraint. 15 J. R., 256; 1 Cowen's Treat., 264; 5 Com. Dig., 644; 3 McLean, 158.

*By the Court,* SMITH J. The bill in this case was filed the fourth day of February, 1848, in the U. S. District Court for the county of Milwaukee, in the then Territory of Wisconsin, for the purpose of enjoining the collection of certain notes and mortgage, given by the complainants to Oatley in July, 1847. The bill alleges, in substance, that in the autumn of 1844, the complainant, Fay, was engaged in business in the city of Milwaukee, and when on his way to Boston to purchase his fall stock of goods, he became acquainted with the defendant, Oatley, in Buffalo, N. Y., of whom he purchased goods to the amount of about $2,800, on credit; that in 1845, the complainant, by reason of divers losses, became insolvent and unable to pay his debts, and proposed to compromise with his creditors, most of whom acceded to his terms, and accepted what he was able to pay; that in 1846 he made offers of compromise to the defendant, Oatley, who declined all compromise, but threatened to procure the complainant to be indicted for obtaining goods under false pretences, unless he would pay the whole amount of his indebtedness to the said defendant.

The bill further alleges that during the year 1847 the said Oatley, by the advice of George Blodgett, went before the Grand Jury in and for the county of Erie, in the State of New Nork, and corruptly, falsely, and fraudulently procured the

complainant to be indicted for obtaining said bill of goods upon false representations, against the statute of the State of New York in such case made and provided, for the purpose of coercing the complainant to the payment of said debt. That during the year 1847, by reason of said indictment, the Governor of the State of New York issued his requisition upon the Governor of the the Territory of Wisconsin for the surrender of said complainant as a fugitive from justice; whereupon the Governor of Wisconsin issued his warrant for the apprehension of the complainant, which, by the procurement of Oatley and Blodgett was placed in the hands of one J. T. Allen, with directions to arrest the complainant. That on or about the first day of July, 1847, the complainant being in Winnebago county on business, was arrested by the said Allen, and taken from thence to Watertown, where he met Oatley and Blodgett; that after spending some time at the latter place, Oatley and Blodgett directed the complainant to be hand-cuffed, which was done by said Allen; after which he was placed in the wagon of Blodgett, who took a seat therein, and the team was started on the road to Milwaukee, and very soon after, Blodgett began to commiserate the complainant on his situation, and expressed his anxiety to help him out of his difficulty, and prevent his being carried to the State of New York. The bill alleges that Blodgett said he was the attorney of Oatley, and was authorized to negotiate with him for a settlement of the debt, and proposed to release and discharge the complainant from arrest if he would pay or secure said debt, assuring the complainant that he and Oatley had full power to discharge him. That the complainant rejected the proposition, and they continued on their way to the town of Summit, and that on the way thither the same proposition was often repeated; that at Summit, where they stopped for a time, the complainant requested that he might be allowed to see counsel, but was denied; that while there, Blodgett had several interviews with the complainant and urged him to settle the claim, giving, as a reason, that they were determined to run him out of the territory, and that for

such purpose they had relays of horses, that they would give him no opportunity to get counsel or legal assistance, but would take him off to Buffalo, where evidence would be produced to convict him. That, induced by such threats and other violent and harsh treatment, the complainant consented to give the notes mentioned, and the complainant, Collins, his brother-in-law, was persuaded to execute the mortgage. That thereupon the complainant was discharged.

Oatley and Blodgett answered separately. They admit the procuring of the indictment, but deny that it was for any other purpose than to punish Fay for the false representations and pretences under which he obtained the goods for which the indebtedness accrued, and deny that Blodgett knew of the indictment until long after the same had been found. They admit that Fay was arrested in the manner and at the place mentioned in the bill, and that he was ironed with hand-cuffs ; but ever that it was because Fay had attempted to escape from the custody of Allen, the deputy sheriff, previous to his arrival at Watertown, and that he was ironed at the suggestion of Williams, the agent of the Governor of New York. The defendants also deny that the said notes and mortgage were given, or any money paid, or any settlement of said indebtedness made with the understanding or agreement that said Fay was to be released, and the said prosecution abandoned; but on the contrary, the said Fay was distinctly informed that any compromise that should be made would not, and could not, "wipe out the crime he had committed, or prevent his being taken to Buffalo to answer the indictment." The answers also deny that after the execution of the notes and mortgage, the irons were taken off from Fay, and that he was told that he could then go free; but aver that the irons were removed before the making of the notes and mortgage, and that no threats of any kind were used to induce Fay to execute the same, which was for considerably less than the sum actually due ; and that as a consideration for the said Collins joining in the mortgage the said Oatley transferred to him all of Fay's indebtedness to the said Oatley. The answers of both the defendants deny .

that Fay was discharged immediately after the settlement at Summit, but aver that he was taken from Summit to Milwaukee in custody of Allen, there to be delivered over to Williams, but that, on arriving at the latter place, Fay made his escape.

The circumstances of this escape are so graphically described in the answer of Blodgett, that that portion is here inserted :

" This defendant further answering, saith, that immediately " after the conclusion of the settlement of the said debt and " the giving of the securities for the payment of the same, this " defendant, with the said Allen, left Summit aforesaid, in the " carriage of this defendant with said Fay, in the custody of " said Allen as before that time he had been, and proceeded " by way of the village of Waukesha to the city of Milwaukee, " with the view and intention of surrendering him, the said " Fay, to the custody of the said Williams, to be taken to Buf- " falo aforesaid, by virtue of said warrant, as soon as they " should have arrived at Milwaukee aforesaid, and that the " said Williams and the said Oatley at about the same time " followed this defendant and the said Allen and Fay in a sep- " arate carraiage, with the declared intention, on the part of " said Williams, of taking the said Fay into his actual custody " on his arrival at Milwaukee aforesaid.    The defendant fur- " ther states and alleges, that he and the said Allen proceeded " with such expedition as they were able, from Summit afore- " said to Milwaukee aforesaid, with said Fay in the custody of " the said Allen, and arrived at said Milwaukee at about the " hour of twelve o'clock at night, with the said Fay in custo- " dy, and before the said Williams and Oatley had arrived. " That this defendant having no stabling of his own for his " horses, and finding it difficult to get them stabled at that " hour of the night, he drove to the livery stable of Messrs. A. " L. Kane & Co., in said city, with the said Fay in the custo- " dy of said Allen ; and after having commenced to unharness " his said horses, this defendant ascertained that he could not " have them stabled there that night, and the said Fay then

" stated, that one Jones, his brother-in-law, was the keeper of " the Tremont House, which was near by, and that the said " Fay would go there and make arrangements for the accom- " modation of said horses, and would immediately return to " where this defendant and the said Allen were. That the ·" said Fay left for the purpose aforesaid, and not returning as " soon as he alleged he would, this defendant, with said Allen, " went in pursuit of him to the said Tremont House, and there " learned that said Fay had not been there. That immediate- " ly upon obtaining such information aforesaid, this defendant " and the said Allen went to various places in the said city " where they supposed it likely the said Fay might be found, " and with the intention of getting him into the custody of " said Allen, on the said warrant which was then in his hands, " and for that purpose called up several persons, and for a con- " siderable time prosecuted inquiries for him, but were utterly ·" unable to find him. That the said Williams and Oatley ar- " rived in Milwaukee after the arrival of this defendant as " aforesaid, and upon their said arrival, and being informed of " the escape of said Fay, both the said Oatley and Williams " also went in pursuit of him, but were unable to find him. " This defendant further saith, that he in good faith used all " the exertions he could, in conjunction with the said Allen, " Williams, and Oatley, to find the said Fay, and to have him " recaptured and in custody, and he believes that such was " the object and intent of all the persons aforesaid; and this " defendant denies that he connived at, or was in any way pri- " vy to, the escape of said Fay, or had any understanding or " privity with the said Fay, that he was at liberty to escape or " would be allowed to do so. This defendant is informed and " believes that on the next morning after the escape of the said " Fay, as aforesaid, the said Allen, Williams and Oatley made " further inquiries and search for the said Fay, but were una- " ble to find him or to ascertain where he was. This defend- " ant further saith, that he believes that the said Fay kept " concealed in the said city of Milwaukee until after he had as- " certained that the said Wlliams and Oatley had left said city " and gone to Buffalo, and then returned to his house."

It is impossible to read the bill, answers, and evidence in this case, and avoid the conclusion, that the whole machinery employed—the indictment, the arrest, the hand-cuffs, and menaces—was instituted and carried on for the sole and only purpose of compelling the complainant, Fay, to enter into some arrangement for the payment of the claim which Oatley held against him. It is impossible to reconcile the conduct of the parties, as detailed by themselves in their answers, upon any other hypothesis. All the allegations of the defendants, that their sole motive was to see the criminal law vindicated, are utterly falsified by their conduct, as related in their own answers, independent of any other evidence. Is it conceivable that after the settlement was effected at Summit, the defendants desired or intended to hold any further control over Fay? This man, whom it had been found necessary to place in irons on account of his alleged attempt to escape, watched and guarded by four men, is brought into Milwaukee at midnight, and then sent in the darkness, and alone, to look up accommodations for his captors, who remained lingering about a livery stable waiting his return! This man, so eager to escape that on his arrival at Watertown, the agent of the executive of New York directs him to be ironed, is let loose at midnight in the streets of the city of Milwaukee to look up lodgings for his pursuers and accommodations for their horses! And yet these defendants solemnly swear, and would have the court believe, that Fay, then and there, escaped from a custody which they were eager to continue. Can Blodgett be entitled to credit when he swears that he did not connive at Fay's "escape" in Milwaukee, when he turned him loose in the streets at midnight to find accommodations for his and Allen's horses and themselves? What reliance can be put upon the statements of a party who is so utterly refuted by his own conduct? The answer of Oatley does not relieve the matter, but on the contrary, with its evasions and inconsistencies, renders the conclusion unavoidable that no more reliance can be placed upon the one than the other; and the falsity of their statements in regard to the escape of Fay in Milwaukee is so clearly established by all the circumstances of the case, that

we are unable to render much credit to their allegations in regard to other parts of their conduct. The maxim "*Falsus in uno, falsus in omnibus,*" holds as well in regard to answers in chancery as to other modes of evidence.

But though the answers themselves would fail to establish a defence, or sustain the main facts and circumstances claimed by the defendant, the answers themselves are essentially contradicted in the most material points by the evidence given in the case.

Maria C. Mead testified that Blodgett told her in July, 1847, that he arrested Fay out west, brought him to Oconomowoc, or Summit; had hand-cuffed him, and then released him on Mr. Collins giving security for the debt by a mortgage on real estate. That it was the meanest scrape he ever got into, and would rather have given five hundred dollars than to have had anything to do with it.

James Rogan says, that in Watertown he had a conversation with the defendant, Oatley. Oatley told him that the business of himself and party was the pursuit of Fay, the complainant; that they had a requisition for him from the Governor of New York to take him back *on account of a debt of Fay's;* that Fay would have to go east or else pay the money or secure the debt; some two hours after, a party arrived from the north with Fay hand-cuffed; Oatley told the witness that his intention was to run Fay into Milwaukee the same night, and then take a certain boat which was then to leave Milwaukee, and so get him out of Wisconsin before his friends could know anything about it. Oatley left Watertown with the party who had Fay in custody, hand-cuffed.

It also appeared in the evidence that the defendant, Oatley had repeatedly declared his intention of procuring an indictment against Fay, unless the latter would pay or secure him; and further, that he had done so, caused him to be arrested, and that Fay, rather than be taken away, had secured the debt to a large amount. Besides, it is in proof, from the declarations of the parties, that the agreement at Summit and Oconomowoc was, that Fay should be released on giving the securities mentioned in the bill of complaint.

Without recapitulating the evidence in full, we regard the following facts as established, viz: that Oatley contrived the plan of procuring an indictment against Fay in Buffalo, New York, upon a charge of obtaining goods under false pretences for the sole purpose of compelling him to pay or secure a private debt or claim which the former held against the latter; that in pursuance of such plan, he caused an indictment to be found against Fay by the Grand Jury of Erie County, New York, upon which he procured a requisition from the executive of New York upon the executive of Wisconsin, for the arrest and surrender of Fay; that Oatley proceeded to Wisconsin, procured the arrest of Fay upon a warrant issued by the executive of Wisconsin upon such requisition, caused him to be hand-cuffed, threatened to run him out of the State before he could see his friends; that having arrived within some thirty-two miles of Milwaukee, and while Fay was in such custody, he and his brother-in-law, Collins, executed the notes and mortgage set forth in the complainant's bill of complaint, upon the promise or understanding that he should be thereupon released from imprisonment, and that upon such execution and delivery of the notes and mortgage, he was so released.

The principal ground on which the complainants seek to avoid the notes and mortgage set forth in their bill of complaint, is that they were given when the complainant, Fay, was under duress of imprisonment. But we are not inclined to put our judgment in this case upon that ground, and therefore do not feel called upon to enter into a discussion of the principles of law applicable to cases of that kind. That there were harsh and severe threats made use of by the defendants, and that unwarrantable severity was practiced upon Fay by the willing instruments of Oatley, is sufficiently apparent from the whole record in the case. That the release of Fay from imprisonment, agreed upon and effected by the execution of the notes and mortgage by Collins and Fay, is also apparent. But Collins was under no duress. He was free to act or desist from action as he should choose.

Therefore without attempting to decide or inquire how far

a court of equity will protect or shield a friend or relative under circumstances of this kind, we have no doubt that the whole proceedings were illegal and void for another reason.

At the formation of the constitution, the several States solemnly pledged themselves to each other that "A person charged in a State with treason, felony, or other crime, who shall flee from justice and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime." Const. U. S., Art. 4. This was a wise and salutary provision, without which the ends of justice might very often be defeated. It was designed solely to enable each State to vindicate its sovereignty, by bringing to punishment, in its own forum, those who should violate its laws. It is a provision purely of public concernment, made by the States for their own protection, and not in any manner intended for the advantage of a private citizen in the enforcement of his private claims.

But notwithstanding the peculiar character of this public law, adopted solely to facilitate and secure the due administration of public justice, it cannot be denied that it has been scandalously perverted to the aid of private individuals in the enforcement of their private claims. If a creditor in another State deemed his debtor in a western State of doubtful solvency, he would go before a grand jury, or a magistrate, and cause the debtor to be "charged" with incurring the debt by false pretences; then arm himself with a requisition and proceed to threaten, to arrest, to a display of manacles, &c., until the accused, or his friends, should come to such terms as his oppressor might dictate. It requires no process of reasoning, nor any reference to authority to show that such practices are entirely beyond the object and design of this provision of our federal constitution. It is not to be supposed that the executive of any State has knowingly lent himself to such a perversion of the federal compact. Doubtless they have all acted in good faith; but it is only a matter of common history that such requisitions have been very often abused by the parties

whose private interests alone have led to their procurement, and who have ceased to use them as soon as they have succeeded in accomplishing the object intended.

In this case the whole evidence shows most unequivocally, that the only design of Oatly in procuring the indictment and requisition was, to force Fay into the giving of security for the claim he held against him. He so stated repeatedly. He so wrote substantially, in his letter to one Russell. He procured his requisition, and warrant, and after he had arrested Fay, and threatened to run him off, and had kept him hand-cuffed until he and his friends yielded to Oatley's demands, the latter removes the irons, relinquishes the arrest, and all further concern for the peace and dignity of the State of New York ceases. This is such a gross abuse of criminal process as to preclude its sanction by any court of law or equity. Public policy will not permit the process of the State to be so perverted and abused, and all contracts growing out of such perversion and abuse are for that reason utterly void.

It must be remembered that it was the process of this State that Oatley was thus abusing. The warrant on which Fay was arrested and held in custody all the while, was the process of the executive of this State. It would ill become the courts of the State to lend their aid in the consummation of villainy so profound.

There are indeed some minor offences which affect merely the private individual, which may be compromised, and the criminal prosecution stopped, when the injured party is satisfied. But these are wholly of a private nature, like common assault, battery, or the like. The offence here charged is not of that nature. Poole vs. Bounfield, 1 Camp., 55; Collins vs. Blanten, 2 Wils., 341; Poor vs. Woodburn, 25 Vent. 234; Show vs. Spooner, 9 N. H. Rep., 196. If Fay was guilty of the offence it deeply concerned the public that he should be punished. Offences of this character strike at the very foundation of public confidence in all commercial relations. There is no proof of Fay's guilt, but the attitude of the defendant Oatley is the same as though he was actually

guilty. If guilty in fact Oatley compounded the crime for his own private advantage—if he were not guily in fact, then the conduct of Oatley and his confederates, Williams and Blodgett, was even more infamous still. In either case the whole transaction consists in a gross prostitution of a salutary international compact and its appropriate remedial process to the base purposes of private malice or cupidity. The law will not tolerate such abuse of its process, and will hold all contracts or agreements arising out of such corrupt practices utterly null and void. (See May No. 1857 Am. Law Register ,439, Opinion of Redfield, C. J., in Bowen et. al. vs. Buck et. al.)

Decree of the Circuit Court affirmed.