| 52 | 19 |
|----|----|
| 41a | 32 |

| 52 | 19 |
|----|----|
| 42a | 88 |

| 52 | 19 |
|----|----|
| 156 | 572 |

| 52 | 19 |
|----|----|
| 65a | 596 |

## WILLIAM C. BANE et al.

*v.*

## THOMAS DETRICK.

1. CONVERSION—*what constitutes.* The owner of a stock of goods which he kept for merchandizing purposes, for certain reasons left his home for parts unknown, leaving his store in charge of another person, but with no authority to dispose of the stock in any other way than as an ordinary clerk employed to sell goods. The owner not returning at the time he had appointed, the person left in charge sent for another party with whom the owner had a business connection, but entirely distinct from that of the store, and on the arrival of such third party, he was informed by the person left in charge by the owner, of all the facts, and thereupon he took possession of the goods, the two claiming the owner was indebted to them, separately, in considerable sums. The third party so assuming possession, sold from

the stock for some time, collected accounts due the store, and finally closed out the concern by selling the balance of the stock to the person left in charge by the owner. This was *held*, to be a tortious conversion of the goods by the person so disposing of them, such as would support an action of trover by the owner.

2. PARTIES IN TROVER—*joint liability of partners.* Partners may be sued in an action of trover, although there was no joint conversion in fact. A joint conversion may be implied in law by consent of a partner to the acts of his copartners.

3. In this case, one of two partners went to a distant place, and, under claim of securing a debt due to the firm, took possession of a stock of goods belonging to the alleged debtor, and sold them. The other partner, who remained at home, had promised to go there. The proceeds of the goods so sold were credited by him on the account of the firm against the debtor, and on the return home of the partner who had taken the goods, he told his copartner what he had done, who approved of it, and at no time expressed any dissent. It was considered they acted as one in the whole matter, which was designed for their joint benefit as partners, and they were jointly liable in trover.

4. DURESS—*what sufficient to render a contract void.* Where a party having a warrant for an arrest, threatens to execute it unless the person against whom the warrant was issued enters into a certain contract, that has been held sufficient duress to avoid the contract.

5. And even though the arrest would have been illegal, because the warrant was issued by a justice of the peace in one State for an offense committed in another State, yet the ·contract being executed under the threat of an arrest under it, if the threat was of such a character as to terrify a man of ordinary and reasonable firmness, duress would be established and the instrument held void.

6. ABUSE OF PROCESS—*avoids a contract.* Where a chattel mortgage was procured to be executed under a threat of arrest under a warrant, the instrument was held void, not only because it was given under duress, but because it is against public policy to permit such an abuse of process, and no person should have the aid of a court to profit by it.

APPEAL from the Superior Court of Chicago; the Hon. JOSEPH E. GARY, Judge, presiding.

The opinion states the case.

Messrs. SLEEPER, WHITON & DURHAM, for the appellants.

Messrs. Helm & Hawes, for the appellee.

Mr. Chief Justice Breese delivered the opinion of the Court:

This was an action of trover, brought to the Superior Court of Chicago by Thomas Detrick, for the use of C. R. Corbin, against W. C. Bane and Oscar F. Bane, for the conversion of two stocks of goods—one at Garden Prairie, in this State, the other in Marengo, Michigan, the property of the plaintiff.

The general issue was pleaded, and the jury, under instructions from the court, found a verdict for the plaintiff, assessing the damages at three thousand five hundred and thirty-six dollars, for which the court entered judgment. To reverse this judgment, the defendants appeal to this court.

It appears from the record that, in 1866, Detrick was engaged in selling goods on his own account, at a settlement in Boone county in this State, known as Garden Prairie. Early in September of that year, he increased his stock by purchases in Chicago, and, on the first of October thereafter, he entered into an agreement with William C. Bane to buy grain, not then knowing that Oscar F. Bane was in partnership with William C., who, it seems, was the father. After sending two car loads of grain to W. C. Bane, the latter wrote to plaintiff to ship to O. F. Bane & Co., which he afterwards did. Plaintiff carried on his mercantile business, in which the defendants had no interest. He shipped to defendants, on his private account, wheat and other grain, and dressed and live hogs, and also butter, eggs and hides, in which defendants had no interest. The first arrangement was, that W. C. Bane should furnish the money and plaintiff should do the buying and shipping—the profits to be equally divided between them; but when his son, Oscar F., came in, each of them was to have one-third of the profits. Somewhere about the twenty-first of the next January, plaintiff had received a remittance from defendants of twelve hundred dollars, and about that time, he got into a personal difficulty, in which he

was seriously injured, to such an extent as to obscure his faculties and render him unfit for business, added to which were some domestic troubles. He suddenly, about the 25th of that month, decamped for parts unknown, leaving his store in charge of one Goodsell, who had arrived there from Wisconsin about the time of the receipt of this money and the injury, and occupied a room with his family in the store building, a portion of which being occupied by plaintiff with his family. Goodsell was an old acquaintance of plaintiff, and had visited him the preceding year. On Sunday night, he told Goodsell he would go to Chicago and see the Banes and settle up with them and when he returned he and Goodsell would settle their business. He gave Goodsell directions what to do in his absence, and said he would return by Tuesday night. He not returning, Goodsell waited until Thursday, and then wrote to Bane & Co. On Saturday, W. C. Bane came out to Garden Prairie, to whom Goodsell stated all the facts he knew. Bane claimed that plaintiff owed them twenty-nine hundred dollars for cash advanced beyond what they had received for produce plaintiff had shipped to them. They then made a rough estimate of the property in the store, grain on hand, &c., when Bane spoke of attaching it, but claimed a right to the grain as a partner, but not in the store. On a suggestion of Goodsell, that such a course would sacrifice the property, it was abandoned, and Bane remained in the store "as though he belonged there," waiting upon customers, took the books, figured up to see what was standing out, dunned some of the debtors, and remained until his son and partner, Oscar, came out about the middle of the next week. When Oscar came, he and Goodsell invoiced the goods. Goodsell claiming he had invested some seven hundred and seventy-five dollars in the goods, and calling the whole stock $2157, of which, after deducting Goodsell's claim, and another credit in his favor standing on the books, eleven hundred and fifty-two dollars and seventy-eight cents was found to be the value of plaintiff's share of the stock, which Oscar Bane

then sold to Goodsell, taking his three notes for the same, payable in six, twelve and eighteen months from August 15, 1867, the date thereof. All these matters Oscar duly reported to his partner, W. O. Bane.

These are the prominent facts in relation to the Garden Prairie store, and the question arises, do they amount to a tortious conversion of this property by the defendants?

It is only necessary to look at the facts to arrive at a correct decision. Bane, both father and son, knew when they were at Garden city, the true position that Goodsell occupied towards these goods. They knew he had no authority to dispose of them in any other way than as an ordinary clerk employed to sell goods. There is no evidence he was a partner, or that he claimed to be. The Banes and Goodsell acted on the assumption that plaintiff had abandoned the property, and an opportunity was thereby presented by which they could make something out of it.

The weight of the evidence most decidedly is, there was no partnership between Goodsell and the plaintiff, or, probably, was designed when plaintiff so suddenly left, for he said, on leaving, he would go and settle with the Banes, and on his return would settle matters with Goodsell. In all the testimony there is nothing stronger than this to establish a partnership, and it utterly fails to do so. This question was fairly presented to the jury and they found there was no partnership, and we fully concur in the finding.

What, then, is there wanting to prove an actual conversion of these goods? We perceive nothing. If entering a man's store in his absence, taking full possession of it and of his books of account, selling from the stock month after month, collecting money of debtors, and then to close it out, selling the remainder to another, is not a conversion, and a tortious conversion, we should be at a loss to define one. Did not appellants convert this property to their own use, and exercise a dominion over it, inconsistent with the right of any other? Did they not by their acts wholly ignore appellee's rights,

and did they not do all they could do to deprive the owner of his possession? Did they not know that Goodsell was a mere bailee of the property, and that he could give no authority to them to take possession of the store? and they certainly knew the law conferred upon them no right to invade the possession of appellee in the manner they did. Here was an actual tortious conversion.

But it is said appellants are not jointly liable therefor. This point we will consider, after we have addressed ourselves to the facts in regard to the Marengo stock of goods.

It seems that, after taking possession of and selling out the stock in the Garden Prairie store, it was ascertained that appellee had settled down in Marengo, in the State of Michigan, and opened a small store there. Thither went W. C. Bane, and there he procured a warrant against appellee for his arrest, on the charge of obtaining money on false pretences, and also an attachment on his goods, claiming the appellee owed the firm twenty-one hundred and fifty-eight dollars. He entered appellee's store, with the sheriff having the papers, and accompanied by an attorney, and then declared if appellee would not comply with his terms and settle the claim, he would have him arrested. Appellee disputed the claim, declaring that, on a settlement of their business matters, he would not owe them anything. The sheriff attached the goods, and was looking around for boxes in which to remove them. It was then proposed by Bane that appellee should come to Chicago and settle by the books, to which he at once assented, and promised to pay or secure whatever should be found due from him, he all the while asserting there was nothing due. As security that appellee would do this, Bane proposed that appellee should give him a mortgage on the goods, and also give him what there was at Garden Prairie. If he would do this, he would not have the warrant executed or the goods removed—that he would do nothing until they had a settlement, and then, if the amount thus secured was not coming to him, he would relinquish it. Appellee then

told Bane he thought there was property enough at Garden Prairie, and asked him why he did not take his pay out of that. To this, Bane replied that Goodsell claimed the goods, and that he never got a dollar out of that stock.

So soon as the mortgage was executed, Bane offered the stock for sale, on which appellee remonstrated, saying that was not the agreement. Bane pointed to the mortgage, and said the goods were his, and he could do as he pleased with them, and sold them, on the spot, to one Houck, who had a prior mortgage on them, taking his note for four hundred dollars balance, which he had discounted the next day. Houck's mortgage was for more than six hundred dollars, and there was then due upon it six hundred dollars. The goods named in it had been sold and replaced from time to time. The sheriff had the keys in his possession, and he handed them to Houck who was put in possession of the goods by the sheriff and Bane's attorney.

Appellee did go to Chicago for a settlement, as he promised, but nothing came of it. He disputed the amount, and claimed all the time there was nothing due from him. Houck, who is a witness for appellants, states he heard something said about a warrant for appellee's arrest, and heard Bane say unless he paid the claim or secured it by mortgage on his goods he would be arrested. Appellee then appealed to Houck, and said, "Bane says he has a warrant. My God! what shall I do? I am ruined, and I will do anything before I am arrested." Bane told him he had a warrant for his arrest, and if he would not comply with his conditions he would order the sheriff to arrest him. Houck said, "I guess not," whereupon Bane said, "I have a warrant and the sheriff has it." Appellee was not perfectly calm when he signed the mortgage, was very much excited and scared, and seemed to be completely unmanned by the threats to arrest him. After the mortgage was executed, Bane and his attorney at once took possession of the store, and, after the sale of the goods to Houck, delivered possession to him, who received the key from the sheriff on the order of Bane and his attorney.

Richfield, the sheriff, also a witness for appellants, corroborates Houck, and says Bane directed him not to arrest appellee after the mortgage was executed. Bane had previously told him to make the arrest if the case was not setted. He heard Bane say that O. F. Bane & Co. had never received a dollar out of the Garden Prairie store—that the man appellee left in charge claimed all the goods, and that he did not know whether there was a hundred dollars worth there or not.

W. C. Bane discloses, in his testimony, the purpose for which he obtained this warrant, and that was, to coerce by it the payment of this claim. His intention was, if no settlement was made, to have the warrant executed. This he confesses. At the same time he obtained the mortgage, he got from appellee a bill of sale of the Garden Prairie goods, which his son, with his knowledge and approbation, had before sold to Goodsell. Appellee did not read the mortgage; a part of it was read to him, but he says he was in such a state of mind by reason of the warrant for his arrest, that he did not understand the nature of it.

The question presented by these facts is, was the mortgage upon these goods executed under such circumstances as to show entire freedom of action upon the part of the maker, for this is essential to the validity of such instruments. Free consent is the essence of every contract, and if there be compulsion, there is no consent, and moral compulsion, such as that produced by threats to take life, or to inflict great bodily harm, as well as that produced by imprisonment, has always been regarded as sufficient in law to destroy free agency. So threats made by a party having a warrant for an arrest, and threats to execute it unless his demand is complied with, were held sufficient to avoid the transaction. *Foshay* v. *Ferguson,* 5 Hill, 154. In this case, the defendant had a warrant which could not be executed, not having the endorsement required by the statute, under which he threatened to arrest the plaintiff, who, being intimidated thereby, gave up a certain number of cattle to the defendant, and afterwards brought his

action of trover for them.  The action was sustained.  In the case before us, the warrant was illegal, it having issued by a justice of the peace in Michigan for an offense committed in this State.  An arrest under it would have been illegal, yet the mortgage was executed under the threat of an arrest under it, and if it was of such a character as to terrify a man of ordinary and reasonable firmness, duress would be established and the instrument held void.

The case cited goes to this extent, and we think modern rulings of the courts justify it.  The facts show appellee was not " at himself," had not his wits about him, was scared and unmanned by the threat, and there stood the sheriff with the warrant in his hand, and the attorney of Bane, by his presence, giving the proceeding his sanction, and the sheriff about to remove the goods under the writ of attachment, all these justified the exclamation of appellee which is in evidence, and warranted the jury in finding that the mortgage was not executed with his free consent.  Wanting this essential element, it was void; but it had the effect to deprive appellee of his property.  Under it, appellants assumed the ownership of the goods, and transferred them for a valuable consideration to another.  They exercised exclusive dominion over them, converting them to their own use.

The mortgage was void for another reason.  It was executed through a perversion and abuse of criminal process.  It is proved that Bane got out this process and used it to effect a settlement of a claim which there is much evidence to show was unfounded.  It is against public policy that process should be thus used, and no court will allow the results flowing from it to be enjoyed by him who so uses it.  It is a gross abuse of legal process, and no person should have the aid of a court of justice to profit by it.  *Fay et al.* v. *Oatley et al.*, 6 Wis. 42.

To maintain the action of trover under such circumstances, a demand is not necessary to be proved.    2 Hilliard on Torts, 262.

28          BANE *et al.* *v.* DETRICK.          [Sept. T.,

Opinion of the Court.

We come now to the liability of appellants. They insist as the Garden Prairie transaction was consummated by Oscar F. Bane alone, he only is responsible; and that William C. Bane, having been the actor in the Marengo matter, he alone is responsible for that, and that jointly they are not responsible for either or both.

The proof in regard to the Garden Prairie stock is, that both participated in the transaction. It was the remnant only that O. F. Bane sold to Goodsell, and the evidence is abundant that both knew and assented to everything that was done in regard to that stock.

The rule is well established that partners may be sued in an action of trover, although there was no joint conversion in fact. A joint conversion may be implied in law by consent of a partner to the act of his copartners. Collyer on Part., sec. 458, referring to Story on Part., sec. 166. *Nicoll* v. *Glennie*, 1 Maule & Sel. 588.

The case cited by appellants—*Gilbert* v. *Emory*, 42 Ill. 143—was an action for a malicious arrest, a matter quite inconsistent with the partnership business. For general acts or omissions violative of law, connected with their business they alone who are guilty will be responsible.

By reference to Story on Partnership, *supra*, it will be seen that torts may arise in the course of the business of the partnership, for which all the members of the firm will be liable, although the act may not, in fact, have been assented to by all the partners. For example, if one of the partners should commit a fraud in the course of the partnership business, all the partners may be liable therefor, although they may not all have concurred in the act. But here was the concurrence of the partners.

That appellants participated in the transaction at Marengo is beyond a doubt. O. F. Bane promised his father to go there. The proceeds of the Marengo stock were credited by him on the account of the firm against appellee, and on the return home of W. C. Bane, he told Oscar what he had done,

who cordially approved of it. Oscar never, on any occasion, expressed any dissent. They acted as one in the whole matter, and it was designed for their joint benefit as partners.

We have now gone over the most prominent points in this case, but have omitted to allude to a glaring fraud practiced upon appellee, when W. C. Bane was threatening to arrest him. He then told appellee he had not realized a dollar from the Garden Prairie store; that Goodsell had claimed it all, leaving the impression that he was in possession under that claim, when the truth was, he was a purchaser from appellants of the only title he had to it. Their whole course in this matter seems to be marked by fraud and falsehood, from which they should not profit.

We have examined the instructions and find no error in them. The whole record shows a case of grievous wrong on the part of appellants. We find nothing in it that would justify this court in disturbing the judgment. Appellants ought to compensate appellee for all the damages he has sustained by reason of their unauthorized and unlawful conduct, and without pausing to make a minute examination of the pecuniary loss to him, we are content to take that as the jury have found it.

We are satisfied that justice has been done, that the evidence sustains the verdict, and there is no error in the instructions. We, therefore, affirm the judgment.

*Judgment affirmed.*