DAUM, Respondent, v. URQUHART, Appellant.

(249 N. W. 738.)

(File No. 7326. Opinion filed July 31, 1933.)

*Churchill & Benson,* and *Longstaff & Gardner,* all of Huron, for Appellant.

*J. P. Sauer* and *Max Royhl,* both of Huron, for Respondent.

POLLEY, J. From the year 1910 down to the time of the trial of this action, defendant has resided in Huron and been engaged in the business of selling Ford cars and accessories and parts of Ford cars. From some time in 1913 until the 18th day of July, 1930, plaintiff was employed by defendant in his said automobile business. For the first few months plaintiff worked as a mechanic in assembling cars. For some time thereafter he was engaged in selling accessories and parts, but was soon promoted to the sales department, where he sold cars and made collections, as well as to sell parts and accessories.

On about the middle of July, 1930, defendant employed one J. D. Carter to make a check on his employees. This was a check as to their honesty, their efficiency, and their manner of doing business. Carter had two assistants, and his mode of operation was to have his assistants go into the stores and salesrooms to make small purchases, observe the general manner of the employee, his attitude toward the customer, and to especially note what the employee did with the cash proceeds of the sale. On the evening of July 17, 1930, Carter's assistants went into defendant's salesroom. One of them purchased a lock for a car door from plaintiff for which he paid plaintiff $1.25; the other purchased a pair of headlight lenses for which he paid 50 cents. Both these parties claimed that plaintiff put these sums of money into his pocket and the cash register did not show that either amount had been put into it. From these circumstances it was assumed that plaintiff had been making a practice of misappropriating the funds of the defendant. It was then decided by defendant that he would make an attempt to recover from plaintiff the money so misappropriated by plaintiff. For this purpose he employed said Carter and Irving Crawford, a practicing attorney at law in Huron. Defendant says these parties were employed for the purpose only "of interviewing and discussing with respondent his handling of appellant's property and affairs during the period of his employment." For the performance of this service defendant agreed to pay Carter one-half of all the money they could get from plaintiff and to pay Crawford

10 per cent of the money they could recover from plaintiff. Pursuant to this arrangement, plaintiff was induced to go to Crawford's office, where, after working on plaintiff some four or five hours, and with the assistance of one Spokely, a son-in-law of defendant, they succeeded in getting $7,000 from plaintiff. Plaintiff, claiming said money had been obtained from him by threats, menace, and duress, and that said money did not belong to defendant, commenced this action for the recovery of the same. In his complaint, plaintiff, among other matters, alleges:

"That the said Crawford and Carter in the office of Crawford & Crawford at said time and place did accuse the plaintiff of a crime, to-wit: the crime of embezzling the sum of Two and 75-100 ($2.75) dollars of the money of the defendant, A. M. Urquhart, claiming that said crime had been committed in the place of business of the defendant on July 18, 1930, in the evening of said day, at a time when the plaintiff was in charge of the outer salesroom and offices of the defendant, and more particularly that at that time and place the plaintiff did sell to the customers and trade of the defendant certain automobile parts and accessories for the sum of Two and 75-100 ($2.75) dollars, which was paid to him in cash, and that he embezzled the same and did not account to the defendant therefor. That the plaintiff at said time and place denied the accusations so made by the said Crawford and Carter, and said that he did not or had not embezzled the sum of Two and 75-100 ($2.75) Dollars of the money or property of the defendant or any other money or property of the defendant. That the said Carter and Crawford after so accusing this plaintiff of said embezzlement did then threaten plaintiff to take him, the plaintiff, to the office of the state's attorney in and for Beadle County, South Dakota, to-wit: W. W. Howes, for purposes of prosecution and public accusation of the said crime of embezzlement of the funds of the defendant, and did say, among other things, to this plaintiff that plaintiff would put a criminal brand upon the wife and child of this plaintiff and would publicly disgrace them, and the said persons did make numerous other threats and accusations against this plaintiff of like nature and tenor and in substance and effect as above set out.

"That thereafter, and in fulfillment of the defendant's plan to threaten, coerce and harass the plaintiff, one Guy Spokesly, a son

in law of the defendant and then employed by the defendant in this transaction herein alleged and set out, did appear at the said office of Crawford & Crawford in continuation of the plan of the defendant, and the said Spokesly did make similar accusations and threats, representations and statements to this plaintiff as had been made by the said Crawford and Carter as above alleged.

"That in the execution of said plan of the said defendant and his attorney, Crawford, and his agents, Carter and Spokesly, this plaintiff was kept in the office of Crawford & Crawford, without access to his friends or attorney or attorneys or anyone with whom to advise and was retained there in such a manner for a period of about four (4) hours, to-wit: from eleven o'clock a. m. of Saturday, July 19, 1930, to about three or four o'clock p. m. of said day. That in the plan so devised, conceived and carried out by the said defendant and his attorney and agents, this plaintiff was kept so retained and restrained in the said office of Crawford & Crawford, first in the presence of one of said three persons and then in the presence of others of said three persons, the said three persons acting in relays in their plan to coerce, harass, threaten and accuse this plaintiff.

"That for a period of about one hour during said time this plaintiff was held and retained in such manner and accused, threatened, harassed and coerced by the said I. R. Crawford and Carter, and after being with said persons for about an hour the said Spokesly appeared at the instance of the defendant at said office, and he continued said coercion, harassing, accusing and threatening said plaintiff and one of the other two men left the said office, and so on during the entire time until about three o'clock p. m. of said day, during which entire time the plaintiff had not been permitted to go to his meals and had not been permitted to counsel or advise with his friends or attorneys in the matter of the accusations, threats and charges of the defendant, his attorney and agents.

"That during said entire time between eleven o'clock a. m. and three o'clock p. m. of said day, the plaintiff protested and contended that he was guilty of no offense, had never embezzled any money or property of the defendant, and if as contended by said persons he had failed to place Two and 75-100 ($2.75) dollars in the cash register of the defendant on the evening of July 18, 1930, the same was through inadvertence and/or mistake, and was wholly

unintentional on the part of the plaintiff. That said persons, Crawford, Carter, and Spokesly, claimed they had positive evidence that the plaintiff had failed to place the said Two and 75-100 dollars in the cash drawer of the defendant, and this plaintiff, being uncertain and indefinite with regard thereto, was by said persons led to believe that he might be guilty of embezzlement or other criminal charge by virtue of said Two and 75-100 dollars; and said plaintiff did through said accusations, threats, coercion and harassing become greatly unnerved and upset, to a point of losing almost complete control of his nerves, and did fear and become fearful of public prosecution for said embezzlement as charged by said persons, and did become fearful and upset by virtue of the threats of disgrace to the wife and child of this plaintiff by virtue of said crime so alleged to have been committed by plaintiff by said persons.

"That as a part of said plan and system of the said defendant and his attorney and agents, the said persons did so charge and accuse this plaintiff during said times and in addition to the matters as above outlined and alleged as follows: That the plaintiff had embezzled on July 18, 1930, the sum of Two and 75-100 dollars of the money and property of the defendant, and that the plaintiff had been employed by the defendant for a period and term continuously of seventeen years, and, therefore, presuming that he had embezzled that sum on that day and based upon that hypothesis, they completed a total embezzlement during the period of seventeen years of Seventeen Thousand ($17,000.00) Dollars, and other like and similar computations, all of which were denied by plaintiff during the entire period.

"That by said system, scheme and plan of the defendant, his attorney and agents, this plaintiff through said coercion, threats, intimidation, accusations, harassing and annoyance, became fearful and afraid of said public accusations, criminal proceedings and disgrace to home and family, and thereby physically and mentally became subject to the control of the defendant, his attorney and agents, and upon the demand of said attorney and agents this plaintiff did agree to pay to the defendant the sum of Seven Thousand ($7,000.00) Dollars in order to save himself from public prosecution for said charge of embezzlement, and to have his family and himself from the disgrace and humiliation of said public accu-

sations and criminal prosecution so threatened by the defendant, his attorney and agents, and solely because of said accusations, threats, coercion, intimidation and harassment, and because of the fear created in the mind of the plaintiff by virtue thereof.

"That in pursuance to said agreement to pay Seven Thousand ($7,000.00) Dollars, the plaintiff was taken from the office of Crawford & Crawford by I. R. Crawford, under his control and in his presence, to the National Bank of Huron, Huron, South Dakota, where this plaintiff obtained a cashier's check in the amount of Seven Thousand Dollars ($7,000.00) payable to himself, the plaintiff, all of which was in pursuance to the demands of the defendant, his attorney and agents. That from said bank this plaintiff was by said attorney, I. R. Crawford, returned to the office of Crawford & Crawford, where in accordance with the plan and scheme of the defendant, he, the plaintiff, was met by the defendant in person and by the said Spokesly, Carter and Crawford. That by virtue of the facts above alleged and set out, the plaintiff was at that time reduced to such a physical and nervouse condition through fear of the charges made that he, the plaintiff, cried in the presence of said persons, and did deliver the said cashier's check to the defendant, his attorney and agents, and because of the then condition of this plaintiff the said defendant personally did advise the said plaintiff to take his, the defendant's automobile and drive in the open air until he had regained his composure and control.

"That thereafter the defendant, his attorneys and agents, did cash said cashier's check of Seven Thousand ($7000.00) Dollars, and that no part thereof has ever been returned to this plaintiff or to anyone for him, though the plaintiff has heretofore demanded its return to him, but the defendant has failed and refused to so return the said money to this plaintiff."

For his answer to the foregoing complaint " * * * defendant alleges that on or about July 19, 1930, this defendant discovered and became convinced that the plaintiff had over a long period of years been taking, converting and appropriating to his own use, and embezzling from day to day moneys of the defendant taken in by plaintiff as a salesman and employee of defendant, amounting to a large sum in excess of fifteen thousand dollars ($15,000.00). That thereupon in compromise of plaintiff's liability to defendant on account of the moneys so taken, converted, appropriated and

embezzled, and as an accord and satisfaction, plaintiff paid to the defendant and defendant received and accepted the sum of Seven Thousand Dollars ($7,000.00) so paid by plaintiff to defendant on that date and not otherwise."

And for a further defense and by way of counterclaim to plaintiff's complaint, defendant alleges:

"That during said employment of plaintiff by defendant as hereinbefore alleged, the plaintiff had occupied a position of trust and confidence to defendant, and defendant has during many years of said employment permitted and allowed plaintiff to sell automobiles and automobile parts, accessories and supplies and to take and receive money, or the equivalent of money, in payment therefor; and defendant has during all of said time placed trust and confidence in the plaintiff and relied on plaintiff to honestly handle said moneys of the defendant so entrusted to him, and to honestly and faithfully account to the defendant for same. That on and shortly prior to July 19, 1930, defendant discovered that plaintiff had during a period of years prior to said date been unfaithful to his said trust and to the confidence reposed in him by defendant and had over a long period of years, from day to day, in the course of his employment taken, appropriated, converted to his own use, and embezzled, moneys of the defendant so coming into the hands of the plaintiff as the employee of defendant and for defendant, amounting to a large sum, the exact amount of which is to defendant unknown, but exceeding the sum of Ffteen Thousand Dollars ($15,000.00).

"That upon discovering the said facts with reference to the appropriation, conversion and embezzlement of the funds of this defendant by plaintiff as hereinbefore alleged, the parties hereto negotiated a settlement of said matter, and as a result of said negotiations and settlement the plaintiff paid to defendant, and defendant received in settlement and in accord and satisfaction of the said sums so taken appropriated and embezzled by plaintiff, the sum of Seven Thousand Dollars ($7,000.00).

"That if the said settlement so made by plaintiff and defendant as alleged in the last preceding paragraph be set aside and held for naught, upon the grounds set forth and alleged in plaintiff's complaint, or otherwise, then defendant demands that an account be taken of all the moneys taken in and received by plaintiff for

and as the employee of defendant from the time of the commencement of the employment of plaintiff by defendant, and an account made of the moneys so received and paid over to defendant and of the amounts not so paid over, that plaintiff may account to defendant for all his dealings with and transactions in regard to said moneys or the equivalent of money belonging to defendant and the amount still due to defendant be settled and determined; and that plaintiff may be adjudged to pay defendant what, if anything, shall upon taking of such account, appear to be due to defendant. And for such other relief as may be just and equitable, including the costs and disbursements of this action."

After the cause was called for trial, and the court and counsel were about to impanel the jury, the defendant moved that the trial proceed in the following order: "First, upon the issues raised by the complaint and defendant's answer to said issues and allegations of said complaint as a matter of law, with the reservation of the equitable counterclaim that in the event the jury find a verdict in favor of the plaintiff that then the issue raised by the counterclaim be tried to the court as an equitable counterclaim and be tried to the court without a jury."

This motion was based upon the ground that the counterclaim called for an accounting upon the fiduciary relation between plaintiff and defendant that involved a long complicated account. This motion was denied, a jury was impaneled, and the case was tried to the jury on all the issues. Verdict and judgment were for the plaintiff, and defendant appeals.

At the trial plaintiff testified: That on the morning of July 19, 1930, Mr. Tillman, who was manager of Mr. Urquhart's automobile store, requested him to go to the law office of Crawford & Crawford. That when he reached that office he was conducted into the private room of Irving Crawford, junior member of that firm. That there he met Mr. Irving Crawford and the said Carter. That Tillman left the room, closing the door as he went out, and that Mr. Crawford introduced plaintiff to Carter. Before Tillman left, he told plaintiff that those gentlemen (meaning Crawford and Carter) wished to ask him some questions about the way they transacted business, and that it would be all right for him to answer any questions they asked. Carter then proceeded to ask him how he handled cash received at the store. Plaintiff explained how they

handled the cash. Carter then produced the door lock above mentioned and asked him if he had sold that to a lady on the previous evening. Plaintiff said he remembered selling such a lock. Carter then produced a pair of lenses and asked if he had sold them. The plaintiff told him that he had. Carter then produced a connecting rod and some piston rings. Plaintiff told him he had sold those also. Carter claimed that the cash register did not show the receipt of these items. Plaintiff said that, if the money had not been rung up in the cash register, it was the result of oversight. Carter then accused plaintiff of stealing the $2.75 received for these articles, and said you cannot come up here and give us that line. We know you stole that $2.75. That Crawford then spoke up and said: "Daum, you have stolen and embezzled from A. M. Urquhart $2.75, and do you know the law on this charge?" Daum said he did not, and that Crawford then said: "It is a penitentiary offense, I know because I have been State's Attorney." That Carter then said: "You are a thief and an embezzler, and they usually jump out of a window (pointing at a nearby window), they cut their throat and commit suicide." The testimony is so voluminous that it will be impossible to give more than the barest outline. But this line of procedure on the part of Crawford and Carter continued from about 11 o'clock until about 12:30. That at that time one Guy Spokely, a son-in-law of Urquhart came in and Crawford and Carter went out to lunch; they were gone something like a half hour during which time Spokely continued with the same line of talk that had been used by Crawford and Carter. Carter and Crawford returned about one o'clock and Spokely left. Crawford and Carter continued to work on plaintiff. That they finally succeeded in getting plaintiff to admit that he had $7,000 on deposit in the bank. As soon as they learned that he had that amount of money in the bank they demanded that he pay that amount to them. That by that time plaintiff was so broken down, fatigued, and excited that he signed a paper prepared by Mr. Crawford which reads as follows, and is in the record as Exhibit No. 3:

"I Carl Daum, do hereby confess that I have appropriated to my own use, on and prior to July 18, 1930, money belonging to A. M. Urquhart which I estimate to be $7,000.00. I make this confession of my own free will and accord and without coercions of any kind, and hereby signify my desire to make restitution. The

restitution which I make I hereby declare to the made voluntarily and without threat of prosecution, and without any undue influence, and actuated solely by a desire to repay to the said Urquhart the money which I have taken from him and converted to my own use.

"[Signed]  Carl E. Daum."

Plaintiff testified that he did not know the full contents of this paper when he signed it, that it was written out by Crawford and given to him, but that he did not have his glasses with him and that he could not read it; whereupon Carter assumed to read the said paper and read it as follows: "I, Carl E. Daum, do hereby agree to settle with A. M. Urquhart for $7,000.00 and that A. M. Urquhart will not prosecute for $2.75"—and that he thought that was the contents of the paper when he signed it. He testified: That during this conversation with Crawford and Carter he had asked permission to consult an attorney; that, when he did so, they told him very well, if he wanted an attorney, they would take him over to the state's attorney and let him take charge of the matter, and in numerous ways threatened to prosecute him and send him to the penitentiary, to disgrace him, and to disgrace his wife and his son, who would have to grow up with a penitentiary father, and much more to similar effect. Plaintiff testified that, when he signed Exhibit No. 3, he was so nervous and unsettled that he did not realize what he was doing; that, as soon as it was signed, Carter said, "We have got the goods on you now, go and get the money—get the cash so that there can be no come back"; that at that time Crawford said, "You better go into the washroom and bathe your eyes," and took plaintiff over to the washroom; that Crawford followed him into the washroom and stayed there with him, and that, while he was in there, Coe I. Crawford came in and spoke to him; that, after he had bathed his eyes, Irving Crawford said, "Well Carl I guess we better go"; that Crawford stayed right with him all the time and took him over to the National Bank of Huron; that, after getting his deposit box, he told the lady at the window that he wanted $7,000 in cash; she replied that it was after banking hours and the money was in the vault and the time lock set, but she told him he could take a draft or a cashier's check. He then procured a cashier's check or draft for $7,000 payable to himself. Crawford then escorted him back to the office, where, in addition to Carter, they found Spokely and the defendant himself waiting for him.

He indorsed the draft and turned it over to Crawford, and then defendant said: "My car is in front of the building. You take that and drive out into the country and pull yourself together and don't come back to work until tomorrow." Plaintiff acted on this suggestion, and, after he had driven away, Crawford took the cashier's check back to the bank, where he turned it in and received some cash and some smaller drafts. Out of the cash he paid his own commission of $700 and took the remaining cash and drafts amounting to $6,300 back to the office and turned them over to Carter and the defendant. Of this amount Carter took $3,150, and what was left was turned over to the defendant.

Carter and Crawford admit all of the main facts in plaintiff's testimony, but denied that duress of any kind was exercised, or that any threats of prosecution were made. They testified that Daum after the first few questions had been asked had freely admitted that he had misappropriated defendant's money, that he had been making a practice of doing so for a long time, and that in the aggregate he had taken a large amount, but that he did not know how much, and had no way of arriving definitely at the correct amount.

The testimony of the plaintiff on the one side, and of Carter and Crawford on the other, as to the manner in which they procured the $7,000 from plaintiff, is so diametrically opposed that the difference cannot be accounted for on any other ground than that the testimony on behalf of one side or the other is deliberately and knowingly false. This presented to the jury a question of veracity of the witnesses so that, if the testimony was submitted to the jury under proper instructions, the verdict of the jury is final upon the facts.

Appellant requested numerous instructions, some of which were given and some refused. Exceptions were taken and saved as to the refusal of requested instructions; also to some of the instructions that were given by the court. Space forbids a detailed consideration of each of these exceptions, nor is it essential. A careful examination of the instructions given by the court satisfies us that the instructions fully and fairly cover all the issues in the case. The action was brought and tried upon the theory that the money involved was obtained from plaintiff by means of duress, menace, threats, and coercion. The court carefully and correctly

defined each of these terms and charged the jury that plaintiff could not recover: "Unless he has shown by a clear preponderance of the evidence that he was induced to pay the same [$7000.00] by duress, menace, threats or coercion, as hereinbefore by these instructions defined. In other words, you can not find a verdict for the plaintiff in any amount unless you find that such a degree of duress, menace, threats, or coercion was used and exerted on and against him as to overcome his free will and to force, compel and coerce him to pay to defendant the sum of $7000, which he would not have otherwise paid."

Again, the court charged the jury as follows: "If you find from the evidence that the $7000.00 was paid and accepted by defendant as and for a compromise settlement and as and for an accord and satisfaction of amounts then owing by plaintiff to defendant, and if you further find that said plaintiff was not then acting under duress, menace, threats or coercion as hereinbefore defined, the Court instructs you that such compromise settlement is valid and binding upon both of the parties. If you find this to be the fact, then you are not concerned with the question of whether the plaintiff paid too much or too little as the parties are bound by their agreement to so compromise and settle their differences provided, as I have told you, that such settlement was arrived at without the use of such duress, menace, threats and coercion as would invalidate such settlement as hereinbefore explained. If the compromise settlement was entered into voluntarily and you so find, it is not necessary that you attempt to determine the exact amount which plaintiff should have paid to the defendant."

Relative to the declaration contained in Exhibit 3, the court charged the jury as follows:

"The evidence in this case shows that the plaintiff herein on the 19th of July, 1930, signed an instrument in writing in which he admitted that he had appropriated to his own use on and prior to July 18, 1930, money belonging to the defendant which he estimated to be $7,000.00; and he therein also stated that the instrument was signed of his own free will and act, and without coercion of any kind, and signified his desire to make restitution; and he also therein stated that the restitution was made voluntarily and without threat of prosecution and without any undue influence, and that he was actuated solely by a desire to repay to the said Urqu-

hart the money which he had taken from him and converted to his own use. This instrument is in evidence and will be taken with you, with the other exhibits in the case, to the jury room. The Court instructs you that when an instrument in writing is executed it is presumed to speak the intention and mind of a party, and the person signing it is presumed in law to know and accept its contents. This is a presumption which may be disputed and proved to be otherwise, but the burden of proof is upon the plaintiff to show that he was coerced to execute this instrument by duress, menace, and undue influence; and the evidence in order to overthrow this presumption must be clear, satisfactory, and convincing. It must appear to you that this instrument would not have been signed or executed or the money would not have been paid to defendant if the alleged threats, menace, duress and undue influence had not been used. And unless it is clearly and convincingly shown that this instrument was given under the influence of threats, duress, menace, and undue influence, it will be deemed to have been given freely and voluntarily.

"If, however, you find that the plaintiff was caused to sign said documents, being Exhibits 1, 2 and 3, or any of them, by duress, menace, threats or coercion as hereinbefore defined, then the same are not to be construed as admissions by him, or the signing thereof binding upon him."

There is no error, certainly no prejudicial error, in the instructions of the court.

■■ It is the contention of appellant that his agents, Carter and Crawford, were not authorized by him to use any unlawful means to obtain money from respondent. That they were employed by him to "perform only the lawful act of interviewing and discussing with respondent his handling of appellant's property and affairs during the period of his employment. Nothing was said, and nothing was contemplated by appellant, in the least respect related to or which could be construed as authorizing any unlawful act on the part of Crawford, Carter or Spokely." Therefore he cannot be held liable for any unlawful acts on their part. In other words, he repudiates their unlawful acts, notwithstanding that he received and still retains the benefit of such acts. By accepting and retaining the benefits of their acts, he thereby ratified such acts. Quoting from the opinion of this court in Wyckoff v. John-

son, 2 S. D. 91, 48 N. W. 837, 839: "It is elementary law that a principal cannot avail himself of the unauthorized act of his agent so far as it is advantageous to him, and repudiate its obligations; and this rule applies as well to implied as to express ratification." And in Morse v. Woodworth, 155 Mass. 233, 27 N. E. 1010, 29 N. E. 525, 527, it is said: "It is a familiar rule that in order to rescind a contract one must return to the other party everything which was received as the consideration of the contract, so as to restore him to his former position."

This is the general rule. Mitchell v. Finnell, 101 Cal. 614, 36 P. 123; Union Trust Company v. Phillips et al, 7 S. D. 225, 63 N. W. 903; Styke v. Sioux Falls Motor Co., 60 S. D. 358, 244 N. W. 387; 21 R. C. L. 919, and numerous cases cited.

■ It is contended by appellant that, conceding that the agents of appellant exceeded their authority in the manner in which they obtained the money from respondent, such acts were ratified by respondent by his failure to proceed more promptly in repudiating the payment of the said $7,000. This contention is without merit. There was no unnecessary delay on the part of respondent in taking steps to recover the money. The cashier's check was turned over to appellant's agents late in the afternoon of Saturday, July 19th. On Monday morning he consulted an attorney in regard to his rights in the matter. On Tuesday, within three days (one of which was Sunday) after the money was paid, respondent had made demand on appellant for the return of the money, and on Thursday commenced this suit for the recovery thereof. It is true that respondent did return to work in appellant's store, where he worked for a day or two, but there was nothing in his conduct to indicate that he intended to ratify the transaction complained of.

■ Error is predicated upon the denial by the court of defendant's motion made before the jury was impaneled to try the issues presented by defendant's counterclaim by the court as an equitable issue. There was no error in the denial of this motion. The intervention of a court of equity was asked for only in case that the jury should find that the $7,000 in question had been obtained from plaintiff by means of duress, threats, menace, and coercion. But there is an age old maxim of equity that, "He who comes into equity must come with clean hands." But, if defendant had obtained this money by extortion, as the jury found he did,

then he is in no position to come into court with clean hands. If the defendant believed, as he claimed he had reason to believe and did believe, that on the 19th day of July, 1930, the plaintiff had been making a habit of misappropriating his money and property, defendant may have had a cause of action for accounting in a court of equity, and could have come into such court asking for equitable relief. But, instead of doing this, he chose to take the law into his own hands—to create his own tribunal and collect what he could from plaintiff by direct methods. This he did, and succeeded in recovering a large sum of money, and, having obtained this money by methods found by the jury to be unlawful, he cannot now complain if he is required to stand upon his legal rights to retain the same. Another reason why he was not entitled, as a matter of right to the aid of a court of equity, is that there is no long, complicated, or mutual account to be considered that cannot be investigated as well and as completely by a jury as by a court of equity.

The evidence shows that, during the some thirty years that the plaintiff had been working for himself, he had accumulated somewhere from thirty to forty thousand dollars in money, property, and securities of various kinds. Defendant contends that, in view of the amount of the pay that had been received by the plaintiff from defendant, he could not possibly have accumulated this amount honestly, and that necessarily he must have stolen and misappropriated a large amount of this wealth from defendant; and it is his theory that anything that plaintiff had in excess of his wages and what defendant considered a reasonable income therefrom belonged to the defendant. The evidence shows that plaintiff had commenced working for himself when he was about 17 years old. He worked on a farm where, although his wages were small, his living was furnished him and practically all he earned was saved. Later on he worked for the railroad company in Huron, where he received fair wages, but he lived with a relative, and, by doing some work and chores, earned enough so that he was required to pay only $10 per month for room and board. After three years, this was increased to $15, but at all times his living expenses were very low. It was his practice from the time he commenced to earn money to put every dollar, above the barest living expenses into a savings account where it was constantly earning interest. As soon

as he had sufficient accumulated to make a loan, it was loaned and made to earn larger interest. He sometimes made small loans without security at a high rate of interest. For other loans, he received security and the ordinary rate of interest. For many years he was a member of the Huron fire department. He received some pay for each fire he attended. From this source alone he received in the aggregate something over $1,400. In 1921 he married a girl, Myrtle Millburn by name. She had been working in various capacities for several years. For something like two years she worked for the North Western Railway Company in their yards in Huron. For this she received fair wages. She lived with a relative at first, where her living expenses were low, and later her mother moved to Huron and she lived with her mother. At the time of her marriage she had something over $2,000 saved. This was turned over to the plaintiff and by him loaned and made to earn interest. Their living expenses were merely nominal. They never owned a home and never bought any furniture, with the exception of a stove, after they were married. They never indulged in a luxury in their lives; they never took a vacation; they never owned a car; in fact, they are a remarkable example of frugality and economy; and no evidence that was introduced by the defendant tends in the slightest degree to dispute any of these facts.

There was no mutual account involved. Defendant's books showed the amount that defendant had paid to plaintiff as wages and commissions. His commissions alone amounted to about $4,000. To ascertain the amount that had been received from the defendant involves only a matter of addition, and the amount so shown was in no wise questioned. On the other hand, the plaintiff had never kept an account of any kind in his life. His savings account kept by the bank was introduced in evidence. This showed the amount of all deposits that had been made by the plaintiff, but there was nothing to show the source from which these items were derived. There was nothing to show whether any particular item was wages, or commissions, or interest on loans, or payment of loans, or money received from the city for services rendered as a fireman. Plaintiff could not, nor could any one, be expected to go back over this account that had been running for something like thirty years and remember the source from which particular items were derived. There was no evidence that showed or tended

to show that any items of this money belonged to the defendant. There was nothing from which a jury could say, or that a court sitting as a court of equity could say, that a cent of this money belonged to the defendant.

The court submitted to the jury the following special interrogatories:

"1. Was the plaintiff caused by duress, menace, threats, and coercion, overcoming his free will, to pay over to defendant the $7000.00 paid on July 19th, 1930? Answer: Yes.

"2. Was the defendant guilty of oppression, fraud or menace, actual or presumed, in recovering from plaintiff the sum of $7,000? Answer: Yes.

"3. What amount, if any, do you fix as punitive or exemplary damages? Answer: None.

"4. What amount, if any, do you find that plaintiff misappropriated of the money of the defendant? Answer: $1.75."

Had the case been tried to the court as an equity case, it would have been perfectly proper for the court had he so desired to have called a jury to ascertain these facts, and, had this been done, appellant would have had no cause to complain of the result.

▮ Defendant was as much responsible for placing this cause on the jury calendar as was the plaintiff. The case was commenced on the 24th day of August. Issue was joined by the service of defendant's answer shortly thereafter. On the 25th day of September following, plaintiff's counsel served upon counsel for defendant a "Notice of Trial" and "Note of Issue." The note of issue contained the statement that the issue to be tried was an issue of "law and fact to be tried to a jury." Admission of service of this note of issue was indorsed in writing thereon by counsel for defendant who then placed upon said note of issue the following indorsement: "Cross service of the within notice of trial and note of issue admitted at Huron, S. D., September 25, 1930." This was signed by counsel for plaintiff. This note of issue was filed with the clerk and required the clerk to place the cause on the jury calendar, and gave the court, as a court of law, jurisdiction of the case, and this jurisdiction was not ousted even though the case involved an accounting. 1 C. J. 614. The court which first acquires jurisdiction will usually retain it to the exclusion of the other. 1 C. J. 614. Defendant does not point out wherein or how

he was prejudiced by the refusal of the court to try this case without a jury. He says he "could not present his evidence to try his counterclaim as an equity case after the trial court had refused to take jurisdiction of it and required that it be tried to the jury. Confronted with this situation, defendant was restricted in the introduction of evidence to such portion thereof as he thought might be grasped or understood by the jury; and was as a matter of tactics deterred from offering such further evidence as he could and would have offered had the counterclaim been tried to the court."

Why he could not present his evidence to try his counterclaim to the jury is not disclosed, nor does he show any reason why he was restricted in the introduction of his evidence, or what evidence he had that the jury could not grasp or understand. Any evidence he had that he "could and would have offered" to the court should have been offered at the trial. Nothing is suggested by the record that the jury could not grasp and understand, as well as the judge or counsel for appellant. The weakness of appellant's case lies in the fact that there is not a scintilla of evidence in the record that proves or tends to prove that plaintiff ever took more than the $1.75 that the jury allowed, except the testimony of Crawford, Carter, and Spokely relative to admissions claimed to have been made by plaintiff, and this testimony the jury, by its verdict, deliberately found to be false.

It is next contended by appellant that plaintiff paid defendant the $7,000 for the purpose of compounding a felony and to buy off the appellant from instituting a criminal prosecution. If this were the fact and the contract were freely entered into by the plaintiff, then he could not recover. But, if plaintiff was put in duress by fear and threats of prosecution by the defendant and the disgrace and humiliation of his wife and son, where he claimed no crime had been committed, the contract may be avoided. Haynes v. Rudd, 30 Hun, 237; Id., 102 N. Y. 372, 7 N. E. 287, 55 Am. St. Rep. 815. This question has been passed upon by this court in two quite recent cases. In Cochrane v. Nelson, 45 S. D. 609, 189 N. W. 700, 702, the plaintiff had executed and delivered to the defendant promissory notes aggregating a considerable sum in satisfaction of damages claimed to have been suffered by defendant

because of the alienation of his wife's affections. Suit was started, and the notes were given to secure a dismissal thereof and to prevent a criminal prosecution and the disgrace and humiliation incident thereto. In the opinion we said: "The question involved in this case is not whether appellant was guilty or innocent, but whether such a degree of pressure was employed as to overcome his free will and coerce him into the making of a contract that he would not otherwise have made. Coercion may be accomplished by a set of circumstances brought about by designing persons as effectually and wrongfully as it may be accomplished by direct threats and menace. The weight of authority is to the effect that threats, actual or implied, of prosecution of one in fact guilty of a crime, will constitute such coercion as will avoid a contract induced by such coercion. 9 R. C. L. 709; Richardson v. Duncan, 3 N. H. 508; Morrill v. Nightingale, 93 Cal. 452, 28 P. 1068, 27 Am. St. Rep. 207; Bane v. Detrick, 52 Ill. 19; Underwood v. Robinson, 106 Mass. 296; Woodham v. Allen, 130 Cal. 194, 62 P. 398."

In Greenfield v. Eberle, 48 S. D. 75, 202 N. W. 291, we followed Cochran v. Nelson, and, applying the same rule in this case, the defendant is not entitled to recover because of a compounding of a felony.

■ While plaintiff was on the witness stand, this question was put to him by his counsel: "Now then Mr. Daum, in the conversation you had in the law office of Crawford and Crawford wherein you have stated certain conversations had by one Spokely and Crawford as you have related here, would you have voluntarily given to the defendant Urquhart the sum of $7,000.00 if it had not been for the duress, coercion and threats that were given to you there in that office?" This was objected to on the ground that it invaded the province of the jury. The objection was overruled, and plaintiff said he would not have done so. Error is predicated upon this ruling by the court. It is the theory of the defense that plaintiff admitted that he had taken considerable sums of defendant's money and that he desired to make restitution, and that it was this desire on his part that prompted him to pay the $7,000. It was for the purpose of showing what really prompted him to pay the money that this question was asked. In Clark v. Mosier, 35 S. D. 54, 150 N. W. 475, we held that this question calls for neither a conclusion nor a self-serving declaration but for a statement

of fact. It was for the purpose of showing the inducement that prompted plaintiff to pay the money. It was not binding on the jury and did not prejudice the defendant. The jury was free to draw its own conclusions as to whether he paid the money because his will had been overcome by Crawford and Carter or whether he was prompted by the desire to pay an honest debt. Appellant cites two cases, Wykoff v. Kerr, 24 S. D. 241, 123 N. W. 733, and Shirley v. Madsen, 52 S. D. 43, 216 N. W. 601, where questions similar to the one here involved were excluded by the trial court and such exclusion was approved by this court, but, in view of the ruling of this court in Clark v. Mosier, supra, the trial court was warranted in admitting the evidence, and we are satisfied that, if error was committed, it was without prejudice to appellant.

Lastly, appellant assigns insufficiency of the evidence to support the verdict. There is little merit in this contention. The evidence was conflicting and presents only a question of the veracity of the witnesses upon which the findings of the jury is conclusive. If plaintiff's version of what took place in Crawford's office is correct, the verdict is right; while, on the other hand, if the testimony of defendant and his witnesses is true, the verdict ought to have been for defendant. But the only corroboration of the testimony for either party is in favor of the plaintiff. He testified that Carter and Crawford worked on him until they overcame his power of resistance and coerced him to pay them $7,000. They testified that plaintiff readily admitted that he had been taking defendant's money, and, after some computation, agreed on the sum of $7,000, and offered to go to the bank and get them that sum of money. Had the transaction been as they claimed it was, plaintiff would not have been under severe strain and would not have shown serious effects there from; yet his appearance was in fact such that, when they were about to go to the bank, Crawford sent him into the washroom to bathe his eyes. After they returned from the bank, plaintiff's appearance was such that defendant suggested that plaintiff take his (defendant's) car and drive out into the country and pull himself together; and Crawford admitted on cross-examination that plaintiff was not normal when he signed Exhibit 3. We think the evidence is sufficient to support the verdict.

The judgment and order appealed from are affirmed.

RUDOLPH, P. J., and ROBERTS and WARREN, JJ., concurring.

CAMPBELL, J. (concurring specially). The crucial point in this case is the fact question as to what actually transpired in the attorney's office on July 19, 1930. The jury have indicated by their verdict that they accepted, in substance, Daum's version of what occurred at that time. There was a square conflict between the testimony of Daum and that of the other witnesses. It may fairly be said that each witness, including Daum, had some interest, direct or indirect, of greater or lesser degree, in having the transaction appear to the court as the witness testified it was. Some of Daum's testimony seems to indicate a marked willingness to disregard the truth upon occasion, and some of his statements seem to test credulity severely. However, after a careful study of the whole record, I have arrived at the conclusion that it ought not to be said in this case that Daum's testimony was so palpably false or incredible as a whole as to render it entirely unreasonable for the jurors, who heard and saw all the witnesses and observed their demeanor, to base a verdict upon the essence thereof if they saw fit.

Believing therefore that the evidence is legally sufficient to support the verdict of the jury, and believing also that no error of law prejudicial to appellant appears upon the record, I concur in the affirmance.